UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN LATRONICA,

                    Plaintiff,

        -against-

LOCAL 1430 INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS
PENSION FUND and LAYNE MCCARTHY,

                    Defendants.

No. 17-cv-00550 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff John Latronica ("Latronica" or "Plaintiff") brings this action against Local 1430 International Brotherhood of Electrical Workers Pension Fund (the "Fund") and Layne McCarthy ("McCarthy") (collectively, "Defendants") asserting claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, arising from the Fund's partial denial of Plaintiff's pension benefit claim. (Compl., ECF No. 1.)

Before the Court is Plaintiff's Motion for Summary Judgment (ECF No. 33) and Defendants' Cross-Motion for Summary Judgment (ECF No. 37). Upon the conclusions set forth below, both motions are GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are drawn from the administrative record and parties' Rule 56.1



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/23/2019

statements,[1] and are not in dispute unless otherwise noted.

## I. The Local 1430 International Brotherhood of Electrical Workers Pension Plan

At issue in this case is the Fund's calculation of Plaintiff's pension benefits under the Local 1430 International Brotherhood of Electrical Workers Pension Plan (the "Plan").

The Fund is a multiemployer labor-management pension fund organized and operated in accordance with ERISA.[2] (Plaintiff's Statement of Undisputed Material Facts Pursuant to Rule 56.1 ("Pl.'s Statement") ¶¶ 11, ECF No. 36.) The Plan, which governs the Fund, provides for the eligibility of pension applicants, the determination of service credits, and the manner in which individual pension benefits are to be determined and calculated. (*Id.* ¶ 37; AR-0705-57.)[3] Under the terms of the Plan, pension benefits are only available to an "employee," defined as "a person in the employ of an employer who worked or shall work in a classification for which the Union acted or shall act as a collective bargaining representative . . . [and] all persons for whom contributions are required to be made to the Fund in accordance with the written agreement

---

[1] Plaintiff has requested that the Court deem Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's Statement") admitted in its entirety. (Plaintiff's Reply Memorandum in Support of His Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment ("Pl.'s Reply Mem.") at 1-2, ECF No. 32.) Plaintiff argues that such action is warranted because Defendants' initial Response to Plaintiff's Statement (ECF No. 40) denies certain facts contained in Plaintiff's Statement without citing to any evidence in the administrative record, in violation of Local Civil Rule 56.1(d). (*Id.*) Defendants subsequently filed a revised Response to Plaintiff's Statement, updated to include citations. (*See* Defendants' Supplemental Response to Plaintiff's Statement ("Defs.' Supplemental Resp. Pl.'s Statement"), ECF No. 30-1.) While Defendants' failure to comply with the Local Rules is noted, the Court chooses to overlook the initial non-compliance to the extent that its Supplemental Response to Plaintiff's Statement complies with the Local Rules. *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 108 n.2 (2d Cir. 2006) (stating that a district court has "broad discretion to determine whether to overlook a party's failure to comply with local rules"). However, any denials in Defendants' Supplemental Response to Plaintiff's Statement that continue to lack evidentiary citations will be disregarded. *See, e.g., Cooper v. Gottlieb*, No. 95-cv-10543 (JGK), 2000 WL 1277593, at *4 (S.D.N.Y. Sept. 8, 2000).

[2] In their Supplemental Response to Plaintiff's Statement, Defendants admit only that the Fund is "an employee benefit pension fund as defined in and covered by ERISA." (Defs.' Supplemental Resp. Pl.'s Statement ¶ 11.) However, they do not affirmatively dispute that the Fund is a multiemployer labor-management pension fund under ERISA. Moreover, Defendants have already admitted this fact in their Answer. (*See* Compl. ¶ 4; Ans. ¶ 4, ECF No. 5.) The Court therefore accepts this fact as true.

[3] "AR" represents the administrative record, filed with the Court at ECF Nos. 24 & 27.

between an Employer and the Trustees." (Pl.'s Statement ¶¶ 38-39; Defendants' Statement of Undisputed Material Facts Pursuant to Rule 56.1 ("Defs.' Statement") ¶ 6, ECF No. 39; AR-0707; AR-0710.) The Plan at times uses the term "Employee" interchangeably with "Participant," which is defined as "any Employee who becomes covered under the Plan." (Pl.'s Statement ¶ 40; AR-0712.) An employee becomes a Plan participant on the later of: (1) the date his employer is first obliged under the collective bargaining agreement to make contributions to the Fund; or (2) the date he begins performing "Covered Employment." (Pl.'s Statement ¶ 41; AR-0709, 0713.) "Covered employment" is in turn defined as the employment of an employee who is either in a collective bargaining unit represented by the Union or is otherwise employed by any employer who is obligated to make contributions to the Fund on his behalf.[4] (Pl.'s Statement ¶ 42; Defs.' Statement ¶ 5; AR-0709.) The Plan limits the maximum amount of credited pension service that an employee can earn to thirty years. (Pl.'s Statement ¶ 43; AR-0708.)

The Plan provides that the Fund shall be administered by the Board of Trustees (the "Trustees"). (AR-0803.) The Trustees are granted the "exclusive authority and discretion" to determine whether an individual is eligible for any benefits under the Plan; determine the amount of benefits, if any, an individual is entitled to under the Plan; interpret all provisions of the Plan; and interpret all of the terms used in the Plan. (Defs.' Statement ¶ 3; AR-0747.) If the Trustees deny a participant's appeal, judicial review of the Trustees' decision is authorized "to determine only whether the decision was arbitrary and capricious." (Defs.' Statement ¶ 1; AR-0745.) In addition, the Plan provides that "[a]ll designations and interpretations made by the Trustees, or their designee" shall be "given deference in all courts of law, to the greatest extent allowed by applicable law" and not be "overturned or set aside by any court of law, unless such court

---

[4] Thus, an individual's entitlement to pension service credit is not contingent upon an employer having made pension contributions on his behalf. (Pl.'s Statement ¶ 44; Defs.' Supplemental Resp. Pl.'s Statement ¶ 44.)

determines that the Trustees have abused their discretion in rendering such determination or interpretation." (Defs.' Statement ¶ 4; AR-0747.)

## II. Plaintiff's Work History and His Employers' Contributions to the Fund Pursuant to Collective Bargaining Agreements

Plaintiff is a retired video and audio technician and operator. (Pl.'s Statement ¶ 1.)

From 1972 to 1992, Plaintiff was employed by three entities, which were under common control or ownership and operated out of the same address: Technical Operations (1972-73), Techni-Vision Operations (1973-87), and Video Projects (1987-92) (collectively, "Tech Ops"). (Defs.' Statement ¶¶ 7-8.) As an employee for these three companies, Plaintiff served as a cameraman, video tape operator, judge's tape operator, audio engineer, switcher/TD, graphics operator, simulcast operator, and engineer. (Pl.'s Statement ¶ 8; AR-0111.)

In 1973, Tech Ops became a signatory to a collective bargaining agreement with the International Brotherhood of Electrical Worlds Local 1430 (the "Union"). (Defs.' Statement ¶ 10; AR-0663-70.) This collective bargaining agreement provided that the collective bargaining unit consisted of all "employees who are, or may be in the future, engaged in the operation, maintenance[,] and servicing of audio and video closed-circuit television systems and associated equipment." (Pl.'s Statement ¶ 9; AR-0663.) This collective bargaining agreement does not contain any exclusion for supervisors (Pl.'s Statement ¶ 55), nor does it reference any obligations to contribute to the Fund (Defs.' Statement ¶ 10). The only other surviving collective bargaining agreement between Tech Ops and the Union is dated January 1, 1989 and provides that contributions of three percent of gross payroll would be made to the Fund on behalf of "eligible" employees.[5] (Defs.' Statement ¶ 11; AR-0674.)

---

[5] Plaintiff denies that this is the only other contract between Tech Ops and the Union, noting that Tech Ops' 1973 collective bargaining agreement only provided for a three-year term. (Plaintiff's Response to Defendants' Statement

When Tech Ops entered into a collective bargaining agreement with the Union in 1973, Plaintiff was named shop steward to the Union, a position which he held until September 2005. (Pl.'s Statement ¶ 4.) As shop steward, Plaintiff was responsible for collecting the time sheets of his fellow Union members and co-workers, training new employees, and reporting his co-workers' issues or concerns to management. (Pl.'s Statement ¶ 6; AR-0110-11.) In addition, as a result of holding this position, Plaintiff worked exclusively on behalf of his co-workers while sitting in on and being intimately involved in all the Union's contract negotiations with the employer.[6] (Pl.'s Statement ¶ 5; AR-0116.)

Although, as noted above, the record is devoid of any collective bargaining agreement that mentions the Fund prior to 1983, the evidence shows that Tech Ops became a participant in the Fund starting in 1979. (Pl.'s Statement ¶ 13.) According to the evidence, Tech Ops (Techni-Vision Operations in particular) made pension contributions to the Fund on Plaintiff's behalf in September 1979, October 1979, and each month in 1980. (Pl.'s Statement ¶ 13; AR-0215-0222). There are no records of Plaintiff's covered hours or contributions for Technical Operations, Techni-Vision Operations, or Video Projects between 1981 and 1992 (Defs.' Statement ¶ 15; AR223-0491; AR0223-491). Defendants contend that Plaintiff's employer stopped reporting and/or making contributions because Plaintiff became a supervisor in January 1981. (Defs.' Statement ¶ 20.) They further contend that reporting or making contributions on Plaintiff's behalf was no longer required at that point because Tech Ops was not required under any written agreement with the Fund to report or make covered earnings or contributions on behalf of supervisors. (Defs.' Statement ¶¶

of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s Resp. Defs.' Statement") ¶ 11, ECF No. 32-1 (citing AR-0669).)
[6] Defendants dispute this fact insofar as the information provided is insufficient to form a belief as to its truth, noting that the allegation regards action made on behalf of the Union, which is not a party in this action. (Defs.' Supplemental Resp. Pl.'s Statement ¶ 5.) However, they cite no evidence in the record in connection with this denial.

20, 23.) Plaintiff, for his part, denies that he was a supervisor at any time ("Pl.'s Resp. Defs.' Statement ¶ 20; AR-0111) and contends that the Plan does not define "employees" to exclude supervisors (Pl.'s Resp. Defs.' Statement ¶ 23; AR-B0012).

In 1992, Plaintiff started working for a company known as International Sound, which had taken over Tech Ops' contract with the Meadowlands Racetrack—the location at which Plaintiff had been working since 1976. (Pl.'s Statement ¶¶ 7, 15; Defs.' Statement ¶ 16; AR-0006, 0083.) Plaintiff's job responsibilities and duties remained the same as they were during his employment with Tech Ops. (Pl.'s Statement ¶ 17; Defs.' Supplemental Resp. Pl.'s Statement ¶ 17.) The President of International Sound, David Snyder, stated in an October 26, 2016 letter to the Fund that Plaintiff was employed by the company as a technician and that "[a]t no time during his employment was he an International Sound manager." (Pl.'s Statement ¶ 20; AR-0075.) Throughout his employment with International Sound, Plaintiff continued to serve as shop steward to the Union. (Pl.'s Statement ¶ 18; Defs.' Supplemental Resp. Pl.'s Statement ¶ 18.)

International Sound, as a successor employer, became a signatory to the collective bargaining agreement with the Union and a participating employer in the Fund. (Pl.'s Statement ¶ 16; Defs.' Supplemental Resp. Pl.'s Statement ¶ 18.) Like Tech Ops', International Sound's collective bargaining agreement provided that the bargaining unit consisted of all employees engaged in the operation, maintenance, and servicing of audio and video closed-circuit television systems and associated equipment, with no explicit exception for supervisory employees. (Pl.'s Statement ¶ 56.) In addition, Internal Sound's agreement required the employer to contribute to the Fund on behalf of eligible employees, deduct dues from the pay of employees and remit dues to the Union on a monthly basis, and contribute to the Union's welfare fund on behalf of eligible employees for the purpose of providing medical insurance. (Defs.' Statement ¶ 17; Pl.'s Resp.

Defs.' Statement ¶ 18.)

The Fund's records show that, from 1992 to 1995, International Sound only reported covered earnings or contributions to the Fund on behalf of Plaintiff for three months: July 1992, January 1994, and February 1994. (Defs.' Statement ¶ 18; Defs.' Supplemental Resp. Pl.'s Statement ¶ 15; AR-0492-0600.) Plaintiff denies that these are the only months that International Sound actually made contributions on his behalf. (Pl.'s Resp. Defs.' Statement ¶ 18; AR-0075.)

In 1995, the New Jersey Sports and Exposition Authority ("NJSEA") opted to utilize in-house employees to operate the Meadowlands Racetrack and retained Plaintiff as an employee to further that end. (Pl.'s Statement ¶ 21.) According to Plaintiff, his responsibilities remained the same upon transitioning his employment to NJSEA and continued to remain the same in all material respects until he retired in 2015. (Pl.'s Statement ¶ 23.) Defendants dispute this statement, citing to pre-1995 contribution records on which Plaintiff is not listed and other evidence that Defendants view as indicating that he was a supervisor before working at NJSEA. (Defs.' Supplemental Resp. Pl.'s Statement ¶ 23.) Plaintiff remained shop steward to the Union until 2005, at which time he became Chief Engineer/Foreman. (Pl.'s Statement ¶ 26.) Plaintiff continued to work as Chief Engineer/Foreman until his retirement in 2015. (*Id.*)

As another successor employee, NJSEA entered into a collective bargaining agreement with the Union. (Pl.'s Statement ¶ 21.) NJSEA's collective bargaining agreement provided that the bargaining unit consisted of "all employees engaged in the operation, maintenance and servicing of audio and video closed circuit television systems and associated equipment employed by the Employer at its East Rutherford Racetrack facilities, but excluding professional employees, supervisor and managerial executives." (Pl.'s Statement ¶ 24; AR-0684.) NJSEA made pension contributions on Plaintiff's behalf from the start of his employment in September 1995 until 2011,

when it stopped participating in the Fund. (Pl.'s Statement ¶ 25; AR-0008; AR-0013; AR-0632-36.)

According to Defendants, the Fund's records regarding work history, covered earnings, and contributions for covered employees are complete for each of Plaintiff's employers. (Defs.' Statement ¶ 12.) Plaintiff disputes this statement, citing to internal memoranda written by McCarthy in which she explains, among other things, that she was unable to find certain records while looking into Plaintiff's claim. (Pl.'s Resp. Defs.' Statement ¶ 12; AR-0060; AR-0066-67.) Plaintiff further contends that the Fund has been unable to locate its pension contribution records for Technical Operations from 1979 to 1987. (Pl.'s Statement ¶ 14.) Defendants dispute this statement, but fail to provide an evidentiary citation demonstrating that this denial has any basis in fact. (Defs.' Supplemental Resp. Pl.'s Statement ¶ 14.) The Fund acknowledges that it does not have any records showing how Union dues were remitted on Plaintiff's behalf, stating dues remittances records are not retained by the Fund. (*Id.* ¶ 44.)

The administrative record contains contribution records for Techni-Vision from 1979-1992 (AR-0215-0412); Technical Operations from 1988-1992 (AR-0413-91); International Sound from 1992-1995 (AR-0492-0600); and NJSEA from 1995-2011 (AR-0601-62). There are no records pertaining to Video Projects specifically.

## III.    Procedural History

On June 24, 2015, the Fund determined that Plaintiff was only entitled to pension service credits for the years he was an employee of NJSEA (the "Initial Determination"). (Pl.'s Statement ¶ 28; AR-0013-16.) The Fund's primary basis for denying Plaintiff pension service credit for his employment from 1979 to August 1995 was its determination that, effective January 1, 1981,

Plaintiff became a supervisor and therefore was no longer an "eligible participant" under the Plan. (Pl.'s Statement ¶ 29.) The Fund also determined that, other than the duration of his employment with NJSEA, Plaintiff was not engaged in "covered employment" as that term is defined by the Plan. (Pl.'s Statement ¶ 30; AR-0013, 0017.) Having thus determined that Plaintiff earned 16 years and 7 months of pension service credit, the Fund calculated his monthly pension benefit to be $1,254.84. (Pl.'s Statement ¶ 31; AR-0013, 0017.) Had the Fund deemed Plaintiff's employment with Tech Ops and International Sound as "covered employment," Plaintiff would have earned the maximum of 30 years of credit pension service. (Pl.'s Statement ¶ 32.)

On June 28, 2015, Plaintiff, through counsel, submitted a timely written notice of appeal of the Initial Determination with the Fund's Board of Trustees. (Pl.'s Statement ¶ 33; AR-0128-29.) Plaintiff challenged the Trustees' determinations that during most of the claimed period Plaintiff was not an "eligible participant" and that he was not engaged in "covered employment," as defined by the Plan. (AR-0128.)

On July 4, 2015, Plaintiff, through counsel, submitted an amended written notice of appeal with the Trustees to inform them that, in addition to the arguments raised in his previous notice of appeal, Plaintiff intended to argue that he was entitled to credited "past service" for each year he worked prior to his employer's obligation to begin contributing to his pension. (Pl.'s Statement ¶ 34; AR-0130.)

On November 7, 2016, Plaintiff, through counsel, submitted a formal written appeal brief with exhibits in support of his challenge to the Fund's Initial Determination. (Pl.'s Statement ¶ 35.) Plaintiff submitted numerous documents, including statements from co-workers and statements from Plaintiff to McCarthy in the years preceding the Initial Determination.[7] (AR-0076-

---

[7] Where relevant, Plaintiff's submissions are detailed in the Court's substantive analysis of Plaintiff's claims below.

0127.)

On January 6, 2017, the Trustees denied Plaintiff's appeal (the "Final Determination"). (Pl.'s Statement ¶ 36; AR-0133-148.) In its Final Determination, the Trustees found that from "January 1, 1981 [until] the date of his employment by [NJSEA], [Plaintiff] was a supervisor," as that term is defined in the National Labor Relations Act, 29 U.S.C. § 152(11) ("NLRA"). (AR-0133-134.) The Trustees cited the relevant definitions, noting that the NLRA—which provides that unions represent "employees" in the relationship with their employer for collective bargaining—states that the term "employee" shall "not include any individual employed as a supervisor," and defines a "supervisor" as "any individual having authority, in the interest of the employer, to hire, . . . promote, . . . discharge . . . [or] assign [employees] or effectively recommend such action, if . . . the foregoing exercise requires the use of independent judgment." (AR-0137-38.) Based on these definitions from the NLRA and its finding that Plaintiff was a supervisor, the Trustees concluded that Plaintiff was neither an "eligible" employee as required by the collective bargaining agreement nor an "employee" engaged in "covered employment" as those terms are defined by the Plan. (AR-0136-38.)

In support of its conclusion that Plaintiff became a supervisor in 1981, the Trustees provided the following explanation. First, they cited a document that was purportedly used by the Fund to record contributions made on behalf of Plaintiff (AR-0138-39 (citing AR-B0061-62).) This document contains a notation that reads "terminated 1/81." (*Id.*) The Trustees concluded that this "could only reflect the termination of the obligation to contribution to the Fund on his behalf due to his supervisory status," given that Plaintiff was employed by Tech Ops for 12 years thereafter. (AR-0139.) In other words, the Trustees found that the contributions must have ceased on this date "because [Plaintiff] was a supervisor [and] not a unit employee on whose behalf a

contribution was required or, under these circumstances, even permitted by law." (*Id.*) Second, it pointed to a document that reads "Supervisors" and contains the names of certain Tech Ops employees, including Plaintiff's. (AR-0139 (citing AR-B0091)). This document also includes the term "Employer Contributions" and has a list of payments next to the names. (*Id.*) However, the Trustees explained that the value of the listed payments suggested that they were *not* pension contributions, but rather dues payments made to the Union by persons that were recognized as supervisors. (*Id.*) In addition, the Trustees noted that contributions were terminated for all employees whose names appear on that list of alleged supervisors, while contributions continued for other employees. (AR-0139-40 (citing AR-B0092-97).) Third, the Trustees explained that, during a phone call with McCarthy in 2007, Plaintiff informed her that he had been a supervisor as early as 1976 and paid his dues by personal check. (AR-0140.) The Board characterized Plaintiff's self-identification as a supervisor as "self-explanatory" and reasoned that Plaintiff's payment of dues by personal check further evidenced that his employment was not covered by the collective bargaining agreement because "[e]ach and every [collective bargaining agreement] the Union signs requires the employer to deduct dues from the pay of unit employees covered by the terms of the agreement." (*Id.*) Fourth, the Trustees pointed to several statements from other unit employees that Plaintiff provided as part of his application. (AR-0140-41 (citing AR-B0103-08).) While these statements were provided in support of Plaintiff's assertion that he was a Union member performing bargaining work, the Trustees concluded that the statements in fact illustrated that Plaintiff worked as a supervisor because the statements identify Plaintiff as a "foreman" and as someone who hired and trained other employees. (AR-141 ("The responsibility to train, and more importantly, hire employees are specific indicia of supervisory status pursuant to the [NLRA].") Fifth, the Trustees stated that a Tech Ops employee told the Fund that Tech Ops agreed

that supervisors could remain union members but were not entitled to benefits and identified Plaintiff as one of the supervisors covered by this agreement. (AR-0142.) Sixth, they pointed to an e-mail sent to the Fund on June 27, 2013, in which Plaintiff stated, *inter alia*, that he hired employees. (*Id.* (citing AR-B0109-13).) Seventh, and finally, the Trustees cited a July 9, 2014 e-mail from Plaintiff to McCarthy, which they understood as illustrating that Plaintiff "was in charge at the facility, made schedules, referred employees to other locations for work, arranged replacement employees . . . for others who were unable to work, received complaints about employees and resolve[d] them, . . . exercised independent judgment, [and] effectively recommended the promotion [and] hiring of employees." (AR-0142 (citing AR-B0114-21).)

With respect to his position at International Sound, the Trustees found the following evidence to support a finding that Plaintiff was a supervisor. First, Plaintiff asserted that he continued to perform the same job at International Sound that he did at Tech Ops;[8] because the evidence showed (in the Trustees's view) that Plaintiff was a supervisor at Tech Ops, Plaintiff was "by his own admission" a supervisor at International Sound. (AR-0144.) Second, Plaintiff's name does not appear on a list that the Union sent to International Sound on December 29, 1994, which (according to the Fund) identifies the unit/Union members employed by International Sound and their Union entry date, as well as the employees for whom the Union needed authorization cards. (*Id.* (citing AR-B0134-0137).) Third, when McCarthy called International Sound in 2007 to inquire about the existence of any company records of pension contributions made on Plaintiff's behalf, an individual named Pat Weber responded that the existing company records reflected no such contributions. (AR-0144.)

The Trustees recognized that Pat Weber's statement conflicted with other evidence in the

---

[8] The Trustees noted, but apparently did not credit, Plaintiff's assertion that he was never a supervisor. (AR-0143.)

record, namely, a records showing that International Sound made contributions on Plaintiff's behalf for three months (AR-B0063) and an October 20, 2016 letter from David Snyder, International Sound's President, stating that Plaintiff was a dues-paying member of the Union and the company contributed on Plaintiff's behalf to the Tri-Union Health Fund, withheld Plaintiff's Union dues, and contributed three percent of Plaintiff's gross payroll to the Fund (AR-B0133). (AR-0143-44.) However, the Trustees declined to credit this contradictory evidence. As for the three contributions that were made on Plaintiff's behalf, the Trustees found that they must have been "made in error" because they were inconsistent and intermittent, and because "[n]o explanation was provided for these payments." (AR-0144-45.) With respect to the letter from David Snyder, the Trustees found its credibility refuted by two pieces of evidence. One was a list that International Sound sent to the Union in 1992 containing the names of the unit/Union employees to be covered by the health plan pursuant to the Union contract, on which Plaintiff's name did not appear. (AR-0145 (citing AR-B0138-39).) According to the Trustees, this list undermined the statement in David Snyder's letter that contributions were made on Plaintiff's behalf to the health fund. (AR-0145.) The other was the fact that Plaintiff, as part of his claim, represented that he paid his Union membership dues using personal checks (rather than deductions) and provided his own personal checks for dues payments in December 1993, September 1994, November 1994, December 1994, May 1995, June 1995, and July 1995. (AR-0145 (citing AR-B0140-147).) The Board deemed this to be "telling evidence" that neither Plaintiff nor International Sound recognized Plaintiff to be a unit employee covered by the collective bargaining agreement and, finding no evidence to support a contrary conclusion, it rejected David Snyder's assertion that International Sound deducted dues from Plaintiff's pay and remitted them to the Union on Plaintiff's behalf throughout his employment. (AR-0145-46.)

Having determined that Plaintiff was not entitled to pension credit for the years he served as a supervisor (1981-1995), the Trustees turned to Plaintiff's claim that he should be credited for the contributions that Techni-Vision Operations made on his behalf in 1979 and 1980. (AR-0146.) The Trustees explained that, under the Plan, Plaintiff could prove his entitlement to this credit if (1) he had ten years of vesting service before experiencing a "break year," defined as a year where the employee was credited with 500 or less hours of service; or (2) the aggregate number of years of vesting service before the break year exceeded the number of his consecutive break years. (AR-0146-0147.) Based on its previous finding that Plaintiff was a supervisor from 1981 to 1995, the Trustees concluded that each of those 12 years constituted a break year as defined by the Plan; only the nine years he worked at Tech Ops/Techni-Vision before becoming a supervisor, from September 1972 to January 1, 1981, qualified as vesting service. (AR-0146-47.) The Board then explained that Plaintiff was thus not entitled to credit for the 1979 and 1980 contributions because (1) he did not have ten years of vesting service before 1981, the first break year; and (2) the number of consecutive break years (12) exceeded the aggregate number of years of service prior to the first break year (nine). (AR-0146-47.)

For all of these reasons, the Trustees denied Plaintiff's appeal.[9]

On January 25, 2017, Plaintiff filed the instant lawsuit challenging Defendants' denial of his application for pre-1995 benefits. On January 17, 2018, the Court granted leave for the parties to file their respective motions for summary judgment.

## DISCUSSION

---

[9] Defendants have incorporated many of the facts and conclusions from the Final Determination into their Statement of Undisputed Material Facts. Plaintiff has disputed most of them. (Pl.'s Resp. Defs.' Statement ¶¶ 20-40.) Because it would be repetitive, the Court will not recount each statement or dispute here. However, the Court notes these disputes and will raise them in its analysis where relevant.

# I.     Legal Standard

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment will not lie where there is a "dispute[] over facts that might affect the outcome of the suit under the governing law" and "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The Supreme Court has made clear that 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter[.]'" *Westinghouse Elec. Corp. v. N.Y.C. Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). Rather, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Moreover, in deciding a motion for summary judgment, courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal citation and quotation marks omitted).

The moving party bears the initial burden of pointing to evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by showing "that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal citation and quotation marks omitted).

The party asserting that a material fact is genuinely disputed must support his or her

assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). In addition, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v*, 477 U.S. at 252.

## II.     Plaintiff's Claims Against McCarthy are Dismissed

In their Motion for Summary Judgment, Defendants moved to dismiss all claims against McCarthy on the basis that she is not an administrator or fiduciary of the Fund. (Defs.' Mem. Supp. at 21.) In opposition to Defendants' motion, Plaintiff noticeably failed to address this argument.

This Circuit has affirmed that a partial response to a motion for summary judgment, which argues that summary judgment should be denied as to some claims while not mentioning others, may be deemed an abandonment of the unmentioned claims. *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). Indeed, "a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims[.]" *Id.* at 196. Given that Plaintiff responded to the other arguments raised by Defendants, but did not contest that any claims against McCarthy should be dismissed, it is reasonable to infer that Plaintiff has conceded this point.

Accordingly, Defendants' Motion for Summary Judgment as to all claims against

McCarthy is granted.

## III.    The Fund's Adverse Benefits Determination was Arbitrary and Capricious

### A.  Applicable Law

#### 1. Standard of Review

Pursuant to ERISA, a person denied benefits under an employee benefits plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that courts must review a denial of plan benefits under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case courts should apply the more deferential arbitrary and capricious standard of review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12, 115 (1989).

Here, the Plan expressly grants the Fund exclusive discretionary authority and power to determine eligibility for benefits and to construe the terms and provisions of the Plan. (AR-B007; AR-0819; AR-0824.) Accordingly, the arbitrary and capricious standard applies.

The arbitrary and capricious standard is "highly deferential" and "the scope of judicial review is narrow." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003). Under this deferential standard, "a court may not overturn the administrator's [decision] unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)). "Substantial evidence" has been defined as "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator"; it requires

"more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (quoting *Celardo*, 318 F.3d at 146).

### 2. Weight Given to the Fund's Conflict of Interest

Even under the arbitrary and capricious standard, where a plan administrator has a conflict of interest because it "both evaluates claims for benefits and pays benefit claims," "courts must take [this conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion[.]" *McCauley*, 551 F.3d at 132 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). Such a conflict of interest may "act as a tiebreaker when the other factors are closely balanced." *Glenn*, 554 U.S. at 117, though its weight ultimately "depends on the circumstances." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 140 (2d Cir. 2010) (citation omitted). Specifically, the weight properly accorded to a conflict of interest depends on the "likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117. "Evidence that a conflict affected a decision may be categorical (such as 'a history of biased claims administration') or case specific (such as an administrator's deceptive or unreasonable conduct)[.]" *Durakovic*, 609 F.3d at 140.

Here, there is clearly a conflict of interest because the Plan is jointly administered by both employer and union appointees. *See, e.g.*, *Durakovic*, 609 F.3d at 138-39; *Griffin v. N.Y. State Nurses Ass'n Pension Plan & Benefits Fund*, 757 F. Supp. 2d 199, 210-11 (E.D.N.Y. 2010); *Zarringhalam v. United Food & Commercial Workers Int'l Union Local 1500 Welfare Fund*, 906 F. Supp. 2d 140, 157-58 (E.D.N.Y 2012). Thus, the question becomes what weight to afford this conflict in reviewing the Fund's denial of benefits. Based on the record, the Court concludes that, although there is no evidence that the Fund has a history of biased claims administration, there is case-specific evidence that the conflict of interest influenced the Fund's decision.

First, while the Fund did not point to Plaintiff's benefit amounts as a basis for denying him pre-1995 pension, evidence in the record shows that it was discussed internally. Specifically, McCarthy provided the Trustees with estimated amounts of Plaintiff's pension benefits were he to be credited with service starting in 1972 versus 1995, noting that there was a "HUGE difference" between the two amounts. (AR-0063.) McCarthy also explained to the Trustees that, because Plaintiff's salary was "much, much higher than what other participants have made," his pension benefits (which, under the Plan, are calculated based on salary) "would seem to be out of balance with what the normal pension benefits are." (*Id.*) According to Defendants, McCarthy was merely explaining to the Trustees that, because Plaintiff was earning significantly more than a bargaining unit employee working 40 hours a week would have been expected to earn, it appeared that he was a supervisor. (Defs.' Mem. Supp. at 19-21.) Thus, Defendants argue, the statements do not evidence a bias but rather provide direct support for the conclusion that Plaintiff was not a member of the bargaining unit. (*Id.*) The Court is unpersuaded by this argument. For one, it is not apparent that Plaintiff's salary amount does in fact support a finding of supervisory status. While the discrepancy may raise questions, there is nothing to suggest that it is the result of Plaintiff's promotion as opposed to some more neutral reason. As McCarthy stated to the Trustees, "maybe [Plaintiff] worked 80-hour weeks or maybe he was just paid a higher amount because he had been with the company [for] a long time." (AR-0062.) Indeed, Plaintiff's itemized statement of earnings from the Social Security Administration, which show that his income varied from year to year, could be read as supporting these alternative explanations. (*See* AR-0004-06.) Plus, Plaintiff affirmatively stated to the Fund that his "pay for 40 years was governed on an hourly wage." (AR-0110.) In any case, if this were in fact something that the Trustees found to support their view that Plaintiff was a supervisor, one would expect them to have mentioned it in their written

determinations. Tellingly, Plaintiff's salary and potential benefit amounts are not to be found in any of the Fund's communications with Plaintiff. Moreover, while the Fund asked Plaintiff dozens of questions about the nature of his employment as part of his application, the Fund never asked him, the Union, or his employers to explain why his income was higher than expected. Ultimately, the Trustees were made acutely aware of the financial stakes before deciding whether to grant Plaintiff full pension benefits, never investigated his income discrepancy, and never mentioned this to Plaintiff as a factor supporting their conclusion.

Second, as detailed further in the Court's substantive review of the benefits determination, the Fund's decisionmaking suffered from several deficiencies. In particular, the Fund emphasized evidence favorable to its position while dismissing summarily evidence contrary to its position; offered explanations that were inherently contradictory; and otherwise relied on weak evidence that a reasonable person could not view as substantially supporting the Fund's decision. Take, for instance, the Fund's determination that Plaintiff was a supervisor from 1981 to 1995 but was not a supervisor after 1995. The record indicates that the *only* distinction between Plaintiff's employment before 1995 and after 1995 is that his post-1995 employer, NJSEA, consistently made pension contributions for Plaintiff. However, Defendants have conceded that Plaintiff's eligibility does not turn on whether his employer(s) actually made contributions on his behalf. As a result, the only sensical explanation for the Fund's determination is that it did not want to provide Plaintiff with pension service credit for the years in which it did not receive contributions on his behalf, despite his being otherwise eligible. Indeed, the Fund has admitted as much—in their briefing, Defendants state that they never "inquire[d] into Plaintiff's supervisory status while working at NJSEA" but nonetheless granted him pension credit for those years because "contributions [were] made on Plaintiff's behalf when he worked [there.]" (Defs.' Reply Mem. at 8.) Considering the

Fund's claim that Plaintiff's eligibility turns on his supervisory status—not the amount of contributions an employer made on his behalf—the admission that it did not consider whether he was a supervisor at NJSEA before granting him the related benefits is indeed puzzling. This kind of irrational and one-sided decisionmaking, numerous examples of which are described below, serves as proof that the Fund's conflict of interest affected its decision. *See Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 218 (2d Cir. 2015) (citations omitted).

For these reasons, the Court concludes that the Fund's conflict of interest is relatively important and will be weighted accordingly.

### 3. Evidence to be Considered

In support of their Motion for Summary Judgment, Defendants have submitted an affidavit from McCarthy (ECF No. 41), which Plaintiff argues should be disregarded by the Court insofar as it contains statements beyond the scope of the administrative record. (Pl.'s Reply Mem. at 3.)

"[A] court's review of an ERISA claim under an arbitrary and capricious standard is generally limited to evidence in the administrative record[.]" *Biomed Pharm. Inc. v. Oxford Health Plans (N.Y.), Inc.*, 831 F. Supp. 2d 651, 658 (S.D.N.Y. 2011). However, the Second Circuit has "repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, 'but which discretion ought not be exercised in the absence of good cause.'" *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (quoting *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 289 (2d Cir. 2000). A court's discretion "should not be exercised in cases where a party fails to demonstrate, beyond mere speculation or conjecture, that the 'administrative record is inadequate to conduct a proper review of the administrative decision.'" *Hotaling v. Teachers Ins. & Annuity Ass'n of Am.*, 62 F. Supp. 2d 731, 738 (N.D.N.Y. 1999) (quoting *DeFelice v. Am. Int'l Life Assur. Co. of N.Y.*, 112 F.3d 61, 65 (2d Cir. 1997)).

Here, there is no good cause for the Court to consider McCarthy's affidavit in connection with its substantive analysis regarding the Fund's decision to deny Plaintiff's benefits. Defendants themselves state that McCarthy's affidavit "does not contain evidence that is beyond the [evidence contained in the administrative record], but rather . . . explains documents within the record for the reader." (Defs.' Reply Mem. at 2.) To the extent this is true, consideration of this evidence would not have any bearing on the Court's ultimate decision and Defendants would not be prejudiced by its exclusion. *See Wedge v. Shawmut Design & Constr. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 337 (S.D.N.Y. 2014).

Accordingly, the Court will not consider McCarthy's affidavit in reviewing the Fund's determination.[10]

### B. Application

Plaintiff's challenge to the Fund's partial denial of pension benefits requires this Court to review (1) the Trustees' determination that employees with supervisory status are not entitled to pension benefits under the Plan; and (2) the Trustees' conclusion, based on the evidence in the administrative record, that Plaintiff was not a member of the bargaining unit from 1981 to 1995.

#### 1. The Trustees' Interpretation of the Plan

Plaintiff first challenges the Trustees' construction of the Plan as excluding supervisors from entitlement to pension benefits.

---

[10] This is true notwithstanding the Court's consideration of any statements in McCarthy's affidavit that pertain to the Fund's alleged conflict of interest. *See, e.g.*, *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481 (S.D.N.Y. Mar. 23, 2015) ("[W]hile the Court is permitted to look beyond the administrative record to resolve such peripheral issues as alleged conflicts of interest, it must establish good cause before considering such evidence in its substantive analysis concerning the decision to deny benefits.")

The Supreme Court has held that collective bargaining agreements and ERISA plan documents "must be interpreted according to ordinary principles of contract law." *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 763 (2018). Where the language in such contracts is unambiguous, it is interpreted and enforced in accordance with its plain meaning. *Aramony v. United Way of Am.*, 254 F.3d 403, 412 (2d Cir. 2001) (internal quotation marks and citation omitted). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994). Furthermore, "[a]lthough a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support in a given case." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 935 (2015).

Ultimately, if "both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control . . . [but if] the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d Cir. 1995) (internal quotation marks and citations omitted).

The Plan makes pension benefits available to all "employees," *i.e.*, all persons "in the employ of an employer who worked or shall work in a classification for which the Union acted or shall act as a collective bargaining representative . . . [and] all persons for whom contributions are required to be made to the Fund in accordance with the written agreement between an Employer and the Trustees." (AR707, 710.) An "employee" becomes a Plan "participant" and thus eligible

for pension benefits on the later of: (1) the date his employer is first obligated under the collective bargaining agreement to make contributions to the Fund; or (2) the date the employee begins performing "covered employment" as that term is defined in the Plan. (AR 709, 713.) The Plan defines "covered employment" as the "employment of an employee who is in a collective bargaining unit represented by the Union or who otherwise is employed by any employer who is obligated to make contributions on his behalf to the [Fund] while classified as an employee." (AR709).

Although the Plan does not mention the impact of an individual's supervisory status, the Trustees concluded that supervisors could not be bargaining unit employees who worked in a classification represented by the Union and for whom the employer was required to make contributions. In support of this conclusion, the Trustees cited to the National Labor Relations Act, which states that "the term 'employee' shall . . . not include any individual employed as a supervisor," *i.e.*, "any individual having [the] authority, in the interest of the employer[,] to hire . . . , promote . . . , discharge . . . , [or] assign [employees], or effectively recommend such action, if . . . the foregoing exercise requires the use of independent judgment. (AR-0137-38 (citing 29 U.S.C. § 152(3).) They then stated that, based on this definition, a supervisor would not be considered an eligible employee under the collective bargaining agreements and therefore would not be covered under the Plan. (AR-0138).

Plaintiff argues that the Trustees thus "adde[d] an additional, unwritten requirement for pension benefit eligibility not otherwise contained within the clear and express terms of the Plan." (Pl.'s Mem. Supp. at 18.) The Court agrees.

The Plan's language is unambiguous: an individual is an "employee" if he works in a classification of employment for which the Union acts as a collective bargaining representative or

24

if his employer is required to make contributions on his behalf; an individual is engaged in "covered employment" if he is in the collective bargaining unit or if his employer is required to make contributions on his behalf.

The Tech Ops and International Sound collective bargaining agreements, in turn, state the following. Both agreements provide that the "employer recognizes the Union as the sole and exclusive collective bargaining agent for all [of the employers'] employees who are, or may be in the future, engaged in the operation, maintenance, and servicing of audio and video closed circuit television systems and associated equipment." (AR-671; AR-B0070; AR-B0123.) They further state that the company will contribute to the Fund three percent of the gross payroll for "eligible" employees who attained the age of 21. (AR-0674; AR-B0126.) Tech Ops' agreement does not define "eligible" employees, but International Sound's agreement does: "[e]ligible employees are defined as those have worked an excess of [20] hours per week for [three] continuous months from the date of employment." (AR-B0126.)

Notwithstanding the fact that supervisors are mentioned nowhere in these collective bargaining agreements, Defendants assert that "[i]t is clear that the employers and the Union did not intend for the supervisors to be covered by the [agreements]." (Defs.' Reply Mem. at 7.) In support of this, Defendants note that there are no records of contributions having been made on Plaintiff's behalf from 1981 to 1995 (with the exception of three months in 1992 and 1994) and that, in their view, Plaintiff became a supervisor in 1981. (Defs.' Reply Mem. at 7.) Thus, Defendants argue, it follows that the contributions stopped *because* Plaintiff became a supervisor, illustrating that no one read the collective bargaining agreements to include supervisors. However, this reasoning is circular and rests on Defendants' own understanding of the evidence in the record regarding Plaintiff's supervisory status, which, as discussed further below, is unreasonable. In

other words, because the evidence does not in fact support the conclusion that Plaintiff was a supervisor, Defendants' reading of the collective bargaining agreement is unsustainable. Moreover, this conclusion dismisses without explanation other reasonable possibilities, including that the Fund's records are incomplete or that Plaintiff's employers erroneously failed to contribute to the Fund on his behalf.

Indeed, even assuming that Plaintiff was a supervisor, the evidence still fails to show that supervisors were not intended to be covered by the Tech Ops and International Sound collective bargaining agreements. The Final Determination asserts that "[a]t least one other employee of [Tech Ops] identified in [the list of purported supervisors (AR-B0091)]" confirmed to the Fund that Tech Ops "agreed that supervisors[] were permitted to remain union members but were not entitled to benefits." (AR-0142.) To read the Tech Ops and International Sound agreements as excluding supervisors based on this evidence is problematic for a few reasons. First, this statement only indicates that Tech Ops had such an unspoken agreement and reveals nothing by way of International Sound's practices. More importantly, the Trustees' did not identify which individual on the list of alleged supervisors is responsible for this statement or when this statement was made, and there is no written version of the statement in the record or anything else that could be used to confirm the accuracy of the Trustees' characterization of it. Ultimately, the record contains no evidence, aside from this undocumented statement by an unidentified Tech Ops employee and the lack of contribution records for Plaintiff, to suggest that such an understanding existed. At the same time, certain evidence in the record serves to undermine the Trustees' interpretation. For example, in one document, Plaintiff's former co-worker states that the fact that Plaintiff hired him in 1990 "easily refutes" the Fund's calculation of Plaintiff's benefits. (AR-B0107). Thus, even if Plaintiff worked in a supervisory capacity, this document demonstrates that there was in fact no

understanding among Tech Ops employees that someone in his position would be excluded from pension benefits.

What is more, Defendants state in their papers that they "would like it noted for the record that the Fund is a completely different entity from the Union and has no knowledge over the past [collective bargaining agreement] negotiations[.]" (Defs.' Reply Mem. at 7-8.) In light of this admission, it seems odd that the Trustees would read into the collective bargaining agreements a requirement that is simply not stated anywhere in the agreements themselves and is not reasonably supported by anything in the record. It seems even more odd when considering that Plaintiff, who was involved with Union contract negotiations as shop steward, has consistently disputed the Fund's interpretation. (AR-0110-116.)

Finally, the Trustees' reading of Tech Ops' and International Sound's collective bargaining agreements is in tension with the clear language of NJSEA's agreement. For if, as Defendants claim, the former agreements did not cover supervisors, then why would NJSEA, as a successor employer, feel compelled to include in its agreement a new provision excluding supervisors from coverage? On this point, the Court also notes the absence of any evidence indicating that collective bargaining agreements in this industry are customarily read to exclude supervisors.

For all of these reasons, the Trustees' construction of the Plan was arbitrary and capricious.

### 2. The Trustees' Conclusion that Plaintiff Was a Supervisor

Plaintiff next argues that, assuming arguendo supervisors were not covered under the Plan, the Trustees abused their discretion in concluding that Plaintiff was a supervisor from 1981 to 1995.

ERISA claimants bear the burden of establishing their entitlement to benefits. *Juliano v. Health Maint. Org.*, 221 F.3d 279, 281-88 (2d Cir. 2000). In reviewing a claim for benefits,

administrators "may exercise their discretion in determining whether a claimant's evidence is sufficient to support his claim." *Roganti*, 786 F.3d at 213. Accordingly, "if the administrator has cited substantial evidence in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious." *Id.* At the same time, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), nor "cherry-pick the evidence [they] prefer[] while ignoring significant evidence to the contrary." *Winkler v. Metro. Life Ins. Co.*, 170 Fed. Appx. 167, 168 (2d Cir. 2006). Furthermore, while plan administrators are not required to "scour the countryside in search of evidence to bolster a petitioner's case[,]" where the record is underdeveloped, "it may be arbitrary and capricious for the administrator [of a plan] to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further." *Roganti*, 786 F.3d at 213 (internal quotation marks and citations omitted).

Here, the record indicates that, even if the Trustees' interpretation of the Plan were acceptable, their determination that Plaintiff was a supervisor from 1981 to 1995 was arbitrary and capricious.

At the outset, the Court notes that, despite Defendants' assertions to the contrary (Defs.' Statement ¶ 12), the Fund's records of contributions appear to be incomplete and/or inaccurate.[11] For example, while an internal document purportedly used to track contributions shows that payments were made for a Tech Ops employee named Francis Langston between April 1981 and March 1985 (AR-B0093), the only available contribution records for that time period—the Techni-Vision records—do not contain Francis Langston's name (AR-0224-60.) Furthermore, there are

---

[11] Plaintiff argues that this failure to maintain records should result in this Court shifting the burden onto the Fund to prove that Plaintiff is not entitled to benefits. (Pl.'s Reply Mem. at 5-7.) However, Plaintiff cites to no controlling law in support of this argument.

no records for Technical Operations' contributions prior to 1988, notwithstanding the fact that the company became obligated to make contributions in at least 1983. Similarly, the administrative record contains no contribution records for Video Projects, where Plaintiff was employed from 1987 to 1992. While Technical Operations, Techni-Vision, and Video Projects may be considered as falling under the same corporate umbrella, the evidence shows that each division had its own contribution records. For instance, contribution records exist for both Technical Operations *and* Techni-Vision Operations from 1988 through 1992. (AR-0215-0491.) Additionally, in internal memoranda, McCarthy noted that when she called International Sound to inquire about Plaintiff, someone named Pat Weber told her that the company "had incomplete records but what [records the company did have] indicate[d] that the company did not pay into . . . [the Fund] on his behalf." (AR-0067.) Meanwhile, the Fund's records show that International Sound *did* make contributions on Plaintiff's behalf on three occasions. (AR-0503; AR-0574; AR-0575.) In short, it seems clear that the recordkeeping was lacking. While there is no suggestion that the Fund failed to undertake reasonable efforts to develop the record, the deficiency in the records are relevant insofar as the Fund's determination regarding Plaintiff's supervisory status largely rests on the absence of contribution records for him.

Putting that issue aside, the Fund's determination was arbitrary and capricious for other reasons.

For one, the Fund cherry-picked evidence without explanation. For instance, the Trustees credited Plaintiff's statements that he continued to perform the same job at International Sound that he did at Video Projects/Tech Ops/Techni-Vision, but apparently refused to credit Plaintiff's statements that he did the same job at NJSEA as he did at his previous employers. Relatedly, while the Fund emphasized Plaintiff's statements that suggested his supervisory status under the NLRA

definition, it ignored other statements contained in the same documents that indicated he had no such status—including his statements that he did not have the authority to make independent decisions or deviate from established policy when he deemed it necessary (instead, he would call higher-ups in the company); did not have the authority to transfer or recommend the transfer of any employee to another department; did not have the authority to suspend or lay off an employee, or to recommend such action; did not have the authority to discipline or recommend the discipline of an employee; and did not have the authority to promote an employee, though management would sometimes ask for his opinion about an employee before promoting that person. (AR-B0118-19.) The Trustees did not acknowledge these facts, which directly undermine their finding that Plaintiff was an "individual having [the] authority, in the interest of the employer[,] to hire . . . , promote . . . , discharge . . . , [or] assign [employees], or effectively recommend such action, if . . . the foregoing exercise requires the use of independent judgment. (AR-0137-38 (citing 29 U.S.C. § 152(3).) Instead, they solely credited (and cited) Plaintiff's statements that supported their conclusion. *Cf. Anderson v. Sotheby's, Inc.,* 04 Civ. 8180, 2006 WL 1722576 at *15–16 (S.D.N.Y. June 22, 2006) (benefits determination was arbitrary and capricious where "the Committee relied heavily on certain excerpts from ... self-serving interviews ... to the exclusion of contrary evidence" and "also ignored portions of the interviews that did not support its decision.")

The Trustees treated the statements from Plaintiff's co-workers in the same way. It is true that some of the co-workers state that Plaintiff "hired" them (AR-B0104; AR-B0106; AR-B0107) and that one co-worker characterizes Plaintiff as a "foreman" (AR-B0105). However, those statements and others assert that Plaintiff was shop steward during the years in question and that he was a Union member throughout that time. (*See, e.g.*, AR-0093; AR-0096; AR-0097; AR-0098; AR-B0108.) One states that Plaintiff "referred" him to his position (AR-B0108), which directly

30

supports Plaintiff's statements to the Fund that he did not have the power to hire employees but would occasionally provide references upon management request (Ar-B0118-19). Yet another co-worker affirmed that for 25 years he and Plaintiff "worked hand in hand maintaining the audio/video aspects to run the Meadowlands Racetrack and in later years the engineering and installing [of] the required updates for simulcasting at the track from worldwide racing facilities." (AR-0091.) This last statement directly supports Plaintiff's characterization of his employment duties and provides independent evidence that he was doing bargaining unit work throughout his career, but the Trustees did not acknowledge it, let alone provide a basis for emphasizing other statements over this one.

Similarly, the Trustees asserted that, because Tech Ops and International Sound were required under the collective bargaining agreements to make contributions on behalf of eligible employees and failed to do so for Plaintiff, it necessarily follows that Plaintiff was not a bargaining unit member. However, this conclusion ignores other glaring possibilities, namely, that Plaintiff *was* a bargaining unit member and his employers simply failed to make contributions on his behalf as required, or that his employers or the Fund failed to maintain records of such contributions. Indeed, beyond the recordkeeping issues described above, certain evidence dismissed by the Trustees suggests this was the case, including the letter in which David Snyder, International Sound's President, verified that Plaintiff was a technician on behalf of whom the company made pension contributions and the records showing that contributions were made on Plaintiff's behalf on three occasions in 1992 and 1994.[12] (AR-0075; AR-0503; AR-0574-75.) Again, however, the Trustees did not address these alternative explanations.

---

[12] The Trustees' bases for dismissing this contrary evidence was conclusory. They state that the three contributions must have been made in error because they were inconsistently made and there was no explanation for why they were made. But an obvious explanation for why these payments were made is that Plaintiff was a member of the bargaining unit. As for their inconsistent nature, Defendants have acknowledged that Plaintiff's eligibility is not dependent on

Furthermore, and perhaps most importantly, the Trustees made zero effort to address the import of Plaintiff's position as shop steward in their decisionmaking process. In their motion papers, Defendants admit that "it is unconventional to have a shop steward who is not part of the bargaining unit." (Defs.' Mem. Supp. at 17.) However, they maintain—without further explanation—that this does not alone establish that Plaintiff was in fact a member of the unit, arguing that it is "one mere factor" indicating Plaintiff's entitlement to benefits. (*Id.* at 17-18.) The difficulty is that this piece of evidence is highly suggestive of the fact that Plaintiff was a member of the bargaining unit, and it is not even mentioned by the Trustees. This illustrates the extent to which the Trustees focused almost exclusively on the evidence that supported their view while arbitrarily ignoring significant evidence that undermined it.

Moreover, the Fund's conclusions at times contradict themselves. For example, the Fund found Plaintiff's statements that he was able to hire employees with management approval, make schedules, and train employees to support the conclusion that he was not a bargaining unit member from 1981 to 1995. (AR-0142 (citing AR-B0109-21).) However, in a January 28, 2014 statement to the Fund, Plaintiff explained that his responsibilities at NJSEA included "compiling . . . schedules, training new employees, [and] hiring new employees (with management approval)." (AR0111-12.) In fact, Plaintiff used virtually the same language to describe the nature of his job at each company, including NJSEA. (AR-0110-12.). Nonetheless, the Fund did not deem Plaintiff

---

the employer actually making contributions on his behalf. (Defs.' Supplemental Resp. Pl.'s Statement ¶ 44.) Thus, the fact that International Sound's records fail to show consistent contributions for Plaintiff does not itself speak to whether Plaintiff was or was not a member of the bargaining unit. Regarding David Snyder's letter, the Fund found this evidence refuted by a fax dated July 23, 1992 that David Snyder (who was then Vice President of the company) sent to the Union listing the International Sound employees who were covered by the Health Plan under the collective bargaining agreement. The Fund found it "telling" that this list did not include Plaintiff's name. However, this fax is weak evidence of Plaintiff's supervisory status, as discussed *infra*, and in any event, there is no proffered explanation for the Fund's decision to credit one of David Snyder's statements but not the other. This lack of explanation is particularly noteworthy given that David Snyder's affirmation that Plaintiff was a bargaining unit member speaks directly to Plaintiff's eligibility, whereas the evidence contained in the 1992 fax is much more circumstantial.

to be a supervisor at NJSEA—the added irony being that, after more than a decade of allegedly working in a supervisory role for several employers, a reasonable person would expect Plaintiff to remain in that role upon transitioning to a successor.[13]

The other evidence cited by the Fund cannot reasonably be viewed as substantial evidence of Plaintiff's supervisory status. For instance, in its Final Determination notes that "[a]t least one other employee of [Tech Ops] identified in [the list of purported supervisors (AR-B0091)]" confirmed to the Fund that Tech Ops "agreed that supervisors[] were permitted to remain union members but were not entitled to benefits" and "specifically identified [Plaintiff] as one of the supervisors covered by this agreement." (AR-0142.) As discussed previously, this purported statement by an unidentified employee, which is supported by no other evidence in the record, carries little (if any) weight.

Turning to that list of alleged supervisors (AR-B0091), this document does not provide a reasonable basis for inferring that the individuals listed on it were in fact deemed supervisors by Tech Ops or the Union. While the document reads "Supervisors" at the top, it also states on the bottom that it is a list of "Employer Contributions" made to the pension fund. The Fund concluded that, based on the amount of money listed, the document reflects dues payments rather than employer contributions. Thus, by the Fund's own admission, the contents of this document are misleading and should not be taken at face value. This document can therefore hardly provide the basis for denying Plaintiff's claim.

The 1992 fax from International Sound to the Union listing the Union members covered by the health plan under the Union contract—which does not contain Plaintiff's name—is not

---

[13] The obvious explanation here is that the Fund could not deem Plaintiff a supervisor at NJSEA, given that NJSEA made contributions on Plaintiff's behalf while its collective bargaining agreement expressly excluded supervisors from coverage; with less consistent records for International Sound and Tech Ops, however, the Fund was less constrained in finding that Plaintiff was a supervisor for those employers.

persuasive evidence that Plaintiff was not covered under the bargaining agreement. (AR-B0139.) There is no explanation for how this list was created, and it is directly contradicted by evidence in the record, namely, the assertion of David Snyder that Plaintiff was covered by the health plan throughout his employment at International Sound. (AR-B0133.) Similarly, the 1994 fax from the Union to International Sound listing the names of certain individuals as well as their Union entry dates (AR-B0135-37) is completely without context. There is no explanation for why this document was sent; how it originated; whether it is meant to include all Union members or a certain subset (*e.g.*, new hires); or whether it is even accurate. It is simply a document containing names and union entry dates—nothing more. There is accordingly no basis for Defendants' assertion that this is a comprehensive "list of bargaining unit members." (Defs.' Reply Mem. at 7.)

Lastly, the fact that Plaintiff paid his Union dues by check, in light of the other evidence in the record, does not provide a rational basis for concluding that he was not considered a member of the bargaining unit. While the collective bargaining agreements do state that Union dues could be paid through deductions from employees' salary, they likewise state that the dues deduction was only permitted upon "receipt of an authorization signed by the Employee," which could be revoked by the employee under certain circumstances. (AR-B0071; AR-B0080; AR-B0125.) No evidence in the record suggests that the method an employee used to pay his dues reflected whether he was covered under the bargaining agreements. Moreover, the administrative record does not show that Plaintiff consistently paid his dues by personal check rather than employer deductions throughout his career, and the Fund has admitted that it has no record regarding how Plaintiff's dues were remitted at any given time. The fact that Plaintiff paid dues by personal check on a handful of occasions does not lend support for the conclusion that, from 1981 to 1995, he was not a bargaining unit member.

Thus, the evidence on which the Fund relied was either contradicted by other evidence in the record or was inconclusive—that is, was only persuasive insofar as the Fund made certain assumptions, without support in the record, about the meaning of a given document. What is more, the Fund's reasoning was in many ways inherently contradictory. The unreasonableness of the Fund's decision is exacerbated by the conflict of interest, which offers a simple explanation for why the Fund came to the unsubstantiated conclusion that Plaintiff was a supervisor: the Fund did not want to pay benefits for years that records indicate it was not paid. For these reasons, the Fund's determination that Plaintiff was not a bargaining unit member was arbitrary and capricious.

### C. Plaintiff is entitled to full retroactive and prospective pension benefits and prejudgment interest in the amount of 9%

Having concluded that the Trustees' partial denial of Plaintiff's pension benefits was an abuse of discretion, the Court must determine the appropriate relief. Plaintiff seeks an award of full retroactive and prospective pension benefits, as well as prejudgment interest on his wrongfully-denied benefits. (Pl.'s Mem. Supp. at 22-23.) Defendants have not contested this request.[14]

Because the difficulty here is "not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable," remand of this action is "inappropriate." *Zervos v. Verizon N.Y.*, 277 F.3d 635, 648 (2d Cir. 2002). In addition, remand is not required where it would be a "useless formality." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995). Such is the case here, where the Fund has already revealed its general disposition with

---

[14] In their Memorandum in Support of their Motion, Defendants argue that, should their motion be granted, they be awarded reasonable attorneys' fees. (Defs.' Mem. Supp. at 23.) In their Reply Memorandum, they request the opportunity to conduct discovery on the issue of whether Plaintiff acted in bad faith in bringing this law suit in the event the Court granted their Motion. (Defs.' Reply Mem. at 9.) At no time did Defendants address Plaintiff's request that he be awarded retroactive and prospective benefits and prejudgment interest should he prevail.

respect to Plaintiff's claim. *Cf. Medoy v. Warnaco Emps. Long Term Disability Ins. Plan*, 581 F. Supp. 2d 403, 412 (E.D.N.Y. 2008) (declining to remand where defendants' unreasonable interpretation of the evidence "tipped their hand" as to how they would assess plaintiff's claim on remand).

Accordingly, the Court is inclined to grant Plaintiff's request and does so in the absence of opposition. The Fund must pay Plaintiff the full benefits to which he is entitled under the Plan (retroactive and prospective), as well as prejudgment interest at the rate of 9% pursuant to N.Y. C.P.L.R. § 5004.[15] *See, e.g.*, *Jarosz v. Am. Axle & Mfg., Inc.*, 372 F. Supp. 3d 163, 182 (W.D.N.Y. 2019).

### D. Plaintiff is Entitled to Reasonable Attorneys' Fees

ERISA's fee-shifting provision provides that a district court may in its discretion "allow a reasonable attorney's fee and costs . . . to either party." 29 U.S.C. § 1132(g)(1). Congress intended this provision to encourage beneficiaries to enforce their statutory rights. *Donachie v. Liberty Life Assurance Co. of Boston*, 745 F.3d 41, 45-46 (2d Cir. 2014) (internal quotation marks and citations omitted). "[T]he proper standard for determining whether a fee claimant is eligible for [such] fees is whether the claimant has achieved 'some degree of success on the merits[.]'" *Toussaint v. JJ Weiser, Inc.*, 648 F.3d 108, 110 (2d Cir. 2011). Given that Plaintiff is the prevailing party, his motion for reasonable attorneys' fees is granted. *See Donachie*, 745 F.3d at 47 ("In this case, there is no question that [Plaintiff], as the prevailing party, was eligible for an award of attorneys' fees.").

---

[15] The Second Circuit has identified the following factors as relevant in determining whether to award prejudgment interest: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139-40 (2d Cir. 2000) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) ). Having considered these factors in this case, the Court finds them to counsel in favor of such an award.

Accordingly, Plaintiff shall submit a declaration or affidavit detailing the amount of his reasonable attorneys' fees within 30 days; the Fund shall be permitted to respond no later than three weeks after that date; and Plaintiff shall be permitted to reply no later than one week after the date of Defendant's response, if any.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendants' cross-motion for summary judgment is DENIED. The Fund must pay Plaintiff the full benefits to which he is entitled under the Plan (retroactive and prospective), together with prejudgment interest at the rate of 9%. Judgment will be entered upon the parties' submission of costs and fees associated with this lawsuit. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 33 & 37.

SO ORDERED:

Dated: August 23, 2019

White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge